# ORIGINAL

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2012 JUN 15 A 9: 46

CLERK _Burton_
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

JOHN SCOTT FOSKEY,      )
                        )
        Plaintiff,      )
                        )
    v.                  )        CV 311-069
                        )
MICHAEL J. ASTRUE, Commissioner )
of Social Security Administration, )
                        )
        Defendant.      )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

John Scott Foskey ("Plaintiff") appeals the decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act. Upon consideration of the briefs submitted by both parties, the record evidence, and the relevant statutory and case law, the Court **REPORTS** and **RECOMMENDS**, pursuant to sentence four of 42 U.S.C. § 405(g), that the Commissioner's final decision be **REVERSED** and that the case be **REMANDED** to the Commissioner for further consideration in accordance with this opinion.

## I.      BACKGROUND

Plaintiff applied for DIB on October 3, 2006, alleging a disability onset date of September 21, 2002. Tr. ("R."), pp. 169-73. The Social Security Administration denied Plaintiff's application initially, R. 75, 77-80, and on reconsideration, R. 76, 83-86. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), and the ALJ held a video hearing on May 12, 2010. R. 35-70. At the hearing, the ALJ heard testimony from

Plaintiff, who was represented by counsel, as well as a Vocational Expert ("VE"), Kenneth L. Bennett ("VE Bennett"). See id. After the video hearing, Plaintiff obtained additional testimony from another VE, Debra J. Horton ("VE Horton") and submitted this testimony for review. R. 311-20. On June 4, 2010, the ALJ issued an unfavorable decision. R. 12-29.

Applying the five-step sequential process required by 20 C.F.R. § 404.1520, the ALJ found:

1. The claimant did not engage in substantial gainful activity since September 21, 2002 through his date last insured of December 1, 2006 (20 C.F.R. §§ 404.1571 et seq.).

2. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar spine at L4-5 with facet hypertrophy and bilateral neural foraminal stenosis and a mild bulge at L3-4; chronic serious otitis media with significant loss of left ear hearing; recurrent kidney/ureteral stones; mixed mood disorder; anxiety disorder; and borderline intellectual functioning (20 C.F.R. § 404.1520(c)).

3. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (20 C.F.R. §§ 404.1520(d), 404.1525 & 404.1526).

4. Through the date last insured, the claimant had the following residual functional capacity ("RFC") to perform heavy work[1]: he can stand and walk 6 hours per day without interruption and stand and walk a total of 8 hours in an 8 hour workday. He can sit for 6 hours without interruption and sit a total of 8 hours in an 8 hour workday. He can tolerate occasional exposure to unprotected heights and moving machinery. He can tolerate a moderate level of noise (as in an office). The claimant has moderate limitations in his ability to understand, remember, and execute detailed or complex instructions. He has a moderate limitation in his ability to interact appropriately with supervisors and a moderate (indicating limited but satisfactory)

---

[1]"Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work." 20 C.F.R. § 404.1567(b).

limitation in adaptability to stress and change. Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

5.  Through the date last insured, considering the claimant's age, education, work experience, RFC, and testimony from [VE Bennett], there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR §§ 404.1569 & 404.1569(a)). The claimant was therefore not under a disability, as defined in the Social Security Act, at any time from September 21, 2002, the alleged onset date, through December 1, 2006, the date last insured (20 CFR § 404.1520(g)).

R. 15-29.

When the Appeals Council denied Plaintiff's request for review, the Commissioner's decision became "final" for the purpose of judicial review. 42 U.S.C. § 405(g). Plaintiff then filed this civil action in the United States District Court for the Southern District of Georgia requesting reversal of the adverse decision. Plaintiff argues: (1) the ALJ erred by failing to find that he met Listing 12.05(C); (2) the ALJ failed to address his objections to a consultative examiner's report; and (3) the ALJ improperly used VE testimony because VE Bennett showed bias towards Plaintiff at the video hearing, the ALJ's hypothetical question to VE Bennett did not accurately present his limitations, and the ALJ failed to address VE Horton's testimony. (See doc. no. 9 (hereinafter "Pl.'s Br.") & doc. no. 13 (hereinafter "Pl.'s Reply Br.").) The Commissioner maintains that the decision to deny Plaintiff's application for benefits was supported by substantial evidence and should be affirmed. (See doc. no. 12 (hereinafter "Comm'r's Br.").)

## II. STANDARD OF REVIEW

Judicial review of social security cases is narrow and limited to the following questions: (1) whether the Commissioner's findings are supported by substantial evidence,

Richardson v. Perales, 402 U.S. 389, 390 (1971); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991); and (2) whether the Commissioner applied the correct legal standards. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). When considering whether the Commissioner's decision is supported by substantial evidence, the reviewing court may not decide the facts anew, reweigh the evidence, or substitute its judgment for the Commissioner's. Cornelius, 936 F.2d at 1145. Notwithstanding this measure of deference, the Court remains obligated to scrutinize the whole record to determine whether substantial evidence supports each essential administrative finding. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).

The Commissioner's factual findings should be affirmed if there is substantial evidence to support them. Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991). Substantial evidence is "more than a scintilla, but less than a preponderance: '[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting Bloodsworth, 703 F.2d at 1239). If the Court finds substantial evidence exists to support the Commissioner's factual findings, it must uphold the Commissioner even if the evidence preponderates in favor of the claimant. Id. Finally, the Commissioner's findings of fact must be grounded in the entire record; a decision that focuses on one aspect of the evidence and disregards other contrary evidence is not based upon substantial evidence. McCruter v. Bowen, 791 F.2d 1544, 1548 (11th Cir. 1986).

The deference accorded the Commissioner's findings of fact does not extend to his conclusions of law, which enjoy no presumption of validity. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991) (holding that judicial review of the Commissioner's legal conclusions are not subject to the substantial evidence standard). If the Commissioner fails

4

either to apply correct legal standards or to provide the reviewing court with the means to determine whether correct legal standards were in fact applied, the Court must reverse the decision. Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

## III.    DISCUSSION

### A.    ALJ's Finding that Plaintiff Does Not Satisfy Listing 12.05(C) Is Supported by Substantial Evidence

Plaintiff argues first that the ALJ erred by failing to find that he met Listing 12.05(C), which pertains to mental retardation. Pl.'s Br., pp. 14-20; Pl.'s Reply Br., pp. 1-5. The Commissioner, on the other hand, contends that substantial evidence in the record supports the ALJ's finding that Plaintiff did not meet Listing 12.05(C). See Comm'r's Br., pp. 3-10, 13-15. The Court notes from the outset that Plaintiff bears the burden of showing that his condition meets or equals the Listing. Wilkinson *ex rel.* Wilkinson v. Bowen, 847 F.2d 660, 662 (11th Cir. 1987) (*per curiam*). In order to show that his impairment meets a Listing, Plaintiff needs to meet all of the specified medical criteria; an impairment that manifests only some of those criteria, no matter how severely, does not qualify. Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

At step three of the sequential evaluation process, the Commissioner must determine whether a claimant meets or equals a disability described in the Listing of Impairments, which describes impairments that are considered severe enough to prevent a person from performing any substantial gainful activity. Davis v. Shalala, 985 F.2d 528, 532 (11th Cir. 1993). It is axiomatic that when a claimant's condition meets or equals a Listing, the Commissioner must find the claimant disabled without regard to the claimant's age, education, or previous work experience. 20 C.F.R. § 404.1520(d).

5

At step three of his decision, the ALJ acknowledged that in a November 30, 2009 consultative psychological evaluation, Marvin L. Long, Ed.D., reported that Plaintiff had a full scale IQ of 67, which placed him in the "mental deficient – mild range" of cognitive functioning. R. 21, 525. Nevertheless, the ALJ found that Plaintiff did not satisfy Listing 12.05(C), stating:

> [T]he "paragraph B"[2] criteria of listing 12.05 were not met because the claimant did not have a valid verbal, performance, or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The claimant obtained a Full Scale IQ score of 67. However[,] he[3] opined that the claimant's overall general ability is in the borderline range when everything is considered.

R. 24-25 (citing R. 526).

### 1.    IQ Scores Alone Not Conclusive

Plaintiff argues that the ALJ failed to properly rebut the presumption that Plaintiff suffers from mental retardation based on his IQ score of 67.[4]  Pl.'s Br., p. 16. Specifically,

---

[2] While the ALJ refers to the "paragraph B" criteria, the parties agree that the ALJ was here referring to the criteria under Listing 12.05(C). Pl.'s Br., p. 16 n.6; Comm'r's Br., p. 4 n.2.

[3] While the ALJ did not refer to Dr. Long by name in this sentence, it is clear from the context and the citation to Dr. Long's report that the ALJ is referring to Dr. Long. See R. 526.

[4] The Court notes that Dr. Long assigned Plaintiff scores on a variety of cognitive tests, specifically assessing him with a full scale IQ of 67, as noted in the ALJ's decision. R. 24-25, 525-26. Among Plaintiff's numerous other cognitive scores, Dr. Long found that Plaintiff "scores in the normal range" on the cognitive diagnostic battery test, which is discussed in greater detail, *infra* Part III.A.1.a. and b., and that Plaintiff attained a "Verbal Comprehension Index of 66." R. 526. Plaintiff argues that the verbal comprehension index of 66 represents an IQ score that the ALJ should have used in lieu of the full scale IQ of 67. Pl.'s Br., p. 15 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) for proposition that the ALJ is to use the lowest IQ score indicated when assessing whether he meets Listing 12.05(C)). Even assuming that Plaintiff's verbal comprehension index represents an IQ score, however, the Court finds that the ALJ's failure to use this score in his decision was not erroneous because, for the reasons described below, regardless of whether Plaintiff's IQ score of 66 or 67 is used, the ALJ properly rebutted the presumption that Plaintiff suffered from mental retardation based on these scores.

Plaintiff takes issue with the fact that the ALJ did not provide a more specific explanation of his finding that Plaintiff did not met the criteria of Listing 12.05(C), and he argues that the ALJ simply "regurgitated" Dr. Long's report without conducting any analysis.[5] Id. at 16, 19; Pl.'s Reply Br., pp. 3-4. Plaintiff further argues that even if the ALJ properly considered Dr. Long's report – as opposed to simply "regurgitating" it – Dr. Long's report provides an insufficient basis to rebut the presumption that Plaintiff suffers from mental retardation. Pl.'s Br., p. 18. Contrary to the ALJ's finding that Plaintiff had not presented a valid IQ score, R. 24-25, the Commissioner asserts that the ALJ did not dispute the validity of Plaintiff's IQ score of 67 and contends that the "main reason" Plaintiff cannot satisfy Listing 12.05(C) is because Dr. Long never diagnosed him with mental retardation. Comm'r's Br., p. 5 & n.3. Plaintiff counters that "a closer reading of section 12.00 and specifically listing 12.05 indicates that a diagnosis is not required when the specific criteria are otherwise met." Pl.'s Reply Br., p. 2 n.1. The Court resolves the matter as follows.

As noted above, Listing 12.05(C) pertains to "Mental retardation," which "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. The Listing further provides: "The required level of severity for this disorder is met when . . . [there is] a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other

---

[5]Plaintiff also argues that the ALJ failed to determine whether his IQ scores were valid. Pl.'s Br., p. 15. Yet as noted above, the ALJ explicitly stated that he did not find Plaintiff's IQ score of 67 to be valid. R. 24-25. At any rate, because the ultimate issue is whether the ALJ properly rebutted the presumption that Plaintiff suffers from mental retardation and therefore failed to satisfy Listing 12.05(C), the Court proceeds to examine this issue.

7

mental impairment imposing an additional and significant work-related limitation of function."

Id. Thus, a claimant generally meets the Listing 12.05(C) criteria when he "presents a valid IQ score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than 'minimal effect' on the claimant's ability to perform basic work activities." Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992).[6] The Eleventh Circuit, however, has recognized "that a valid IQ score need not be conclusive of mental retardation where the IQ score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." Id.; see also Hodges v. Barnhart, 276 F.3d 1265, 1269 (11th Cir. 2001) (noting that while a claimant's low IQ scores give rise to a presumption of mental retardation, such a presumption may be rebutted with evidence of daily activities that are inconsistent with a diagnosis of mental retardation); Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986) (*per curiam*) (noting that IQ "test results must be examined to assure consistency with daily activities and behavior").

### a. The ALJ Properly Considered the Record Evidence to Rebut the Presumption of Mental Retardation

The Court turns first to Plaintiff's argument that the ALJ "regurgitated" Dr. Long's report without providing any analysis as to whether Plaintiff suffers from mental retardation. Pl.'s Br., pp. 16, 19. Although Plaintiff argues that the ALJ failed to properly support his step three finding, there is no requirement that an ALJ "mechanically recite the evidence" leading

---

[6] Although paragraph C of the 12.05 Listing sets forth two criteria, an IQ prong and an additional impairment prong, these criteria apply in conjunction with the Listing's definition of mental retardation as "significantly subaverage general intellectual function with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C); see also Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997) (noting the criteria for obtaining benefits under Listing 12.05(C)).

to his step three determination, and the Eleventh Circuit has held that an ALJ may make an implied finding that a claimant's impairments did not meet or medically equal the Listings. See Hutchison v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986) (citing Edwards v. Heckler, 736 F.2d 625, 629 (11th Cir. 1984)).

In his decision, the ALJ discussed Dr. Long's findings at length, noting that Dr. Long reported Plaintiff to be "a slow learner" who "works slowly." R. 21-23 (citing R. 525, 531). He also observed that Dr. Long had to repeat instructions to Plaintiff "frequently and at times three or four times." R. 21, 525. Moreover, as noted above, the ALJ acknowledged Dr. Long's report that Plaintiff had a full scale IQ of 67. R. 21, 525. Further, the ALJ noted Dr. Long's finding that Plaintiff attained low scores on psychometric testing and understanding verbal concepts, although Plaintiff could communicate despite his restricted vocabulary. R. 21, 524-26. Plaintiff also reported that he finished high school at age 21, had to repeat "at least one grade, maybe more," and was enrolled in a combination of regular and special education classes. R. 21, 524.

Yet the ALJ also noted Dr. Long's observation that Plaintiff's "overall general ability is in the borderline range when everything is considered." R. 22, 526. Specifically, the ALJ observed that Plaintiff had normal scores on cognitive diagnostic battery ("CDB") testing, which "is an assessment of decision-making [and] adjusting to changing demands," and Plaintiff's CDB scores led Dr. Long to "suggest ruling out true mental retardation."[7] R. 22 (citing 527-28). Thus, as the ALJ observed, Dr. Long assessed Plaintiff with a cognitive capability of "mental deficient to borderline potential." R. 22, 528. Moreover, the ALJ noted

[7]The Court also notes that Dr. Long observed that Plaintiff "scores in the average range for non verbal reasoning, spatial organization[,] and the Block Design." R. 525-26.

that Dr. Long described Plaintiff's mental status at the exam as "alert, coherent[,] and aware of his own situation. [Plaintiff] knew why he was here today." R. 21, 525.

The ALJ further stated, "Dr. Long reported that [Plaintiff's] prognosis would be seen as guarded *primarily because of the multitude of physical problems* [Plaintiff] reported. Dr. Long opined that [Plaintiff] would be restricted to basic labor and semi-skilled type jobs," but would not be precluded from working. R. 22 (citing R. 528) (emphasis added). The ALJ also noted that Dr. Long found that Plaintiff was capable of handling funds, had mild limitations in his ability to understand, remember, and carry out simple instructions or make judgments on simple work-related decisions, and that Plaintiff had moderate limitations in his ability to understand, remember, and carry out complex instructions or make judgments on complex work-related decisions. R. 22, 531.

In addition to his reliance on Dr. Long's suggestion of ruling out true mental retardation in favor of general overall capacity in the borderline range, R. 25, 526, the ALJ also noted that Plaintiff was able to care for his eight-year old son and performed a variety of chores around the home, R. 21, 26, 525. The ALJ further noted that Plaintiff reported being independent in his activities of daily living, had a driver's license, and was able to shop and travel without a companion for assistance. R. 19, 20, 24, 53, 513, 517.

Although Plaintiff asserts that the ALJ merely "regurgitated" Dr. Long's report, the record reflects that the ALJ thoroughly considered that report, as well as numerous other pieces of evidence, before finding that Plaintiff's IQ score of 67 was inconsistent with his daily activities and behavior. Thus, even assuming that Plaintiff's IQ score of 67 was valid, the ALJ properly considered the record evidence before rebutting the presumption that Plaintiff suffers from mental retardation based on that score. See Hodges, 276 F.3d at 1269 (recognizing

requirement of Listing 12.05(C) for manifestation of mental retardation before age 22 and allowing that Commissioner may use evidence of activities of daily life to rebut presumption of mental impairment).

**b.**     **The ALJ Properly Relied on CDB Testing in Dr. Long's Report**

Plaintiff argues, however, that even if the ALJ properly considered Dr. Long's report rather than simply regurgitating it, the ALJ erred in relying on this report to rebut the presumption of mental retardation. Pl.'s Br., p. 18. Specifically, Plaintiff takes issue with the ALJ's use of Dr. Long's CDB exam to rebut the presumption that Plaintiff is mentally retarded because "Dr. Long does not explain what the CDB exam is, what the range is[,] and what [Plaintiff's] score was on this exam." Pl.'s Br., p. 18. Moreover, Plaintiff argues that the Regulations make no provision for the CDB exam as a valid intelligence test for evaluating Listing 12.05(C), and thus it was error for the ALJ to rely on it as evidence. Id. Plaintiff also contends that because Dr. Long presented conflicting findings – that Plaintiff had low IQ scores and normal scores on other tests – the ALJ erred by failing to contact Dr. Long to clarify this conflicting information. Id.

Contrary to Plaintiff's assertions, however, the ALJ noted Dr. Long's statement that the CDB "is an assessment of decision-making [and] adjusting to changing demands" and that Plaintiff scored in the normal range on this exam, which suggested ruling out true mental retardation. R. 22 (citing R. 527-28). Thus, whatever the scale of the CDB may be, it is clear that Plaintiff's score falls within the normal range of that scale. Further, as the Commissioner correctly asserts, Comm'r's Br., pp. 6-7, IQ tests are only one factor to be used when assessing Listing 12.05(C), and the psychological examiner's narrative report should also assess the

validity and consistency of the IQ scores with a claimant's degree of functional limitation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(a). Here, Dr. Long did exactly that by noting that although Plaintiff had obtained IQ scores indicating mental retardation, other testing and evidence led Dr. Long to suggest ruling out mental retardation and conclude that Plaintiff was not precluded from working. R. 528. Notably, Plaintiff cites no authority to support his argument that simply because a diagnostic test is not listed in the Regulations, the ALJ is therefore precluded from relying on a medical source's interpretation of such testing.

In addition, the Court does not agree with Plaintiff's assertion that Dr. Long provided conflicting information that the ALJ should have resolved. Dr. Long administered a variety of mental exams which tested Plaintiff's aptitude in several different areas of cognitive functioning. See R. 525-30. While Plaintiff obtained deficient scores in verbal comprehension, reading, and writing, his ability to engage in spatial reasoning, make decisions, and adjust to changing demands was in the normal range. R. 525-27. Simply put, absent any explanation by Plaintiff to the contrary, the Court does not see how low verbal comprehension scores are inconsistent with normal scores on separate areas of cognitive functioning. Moreover, Dr. Long was able to draw conclusions from the various test results, as set forth above, stating that Plaintiff was not precluded from working and suggesting that true mental retardation be ruled out. R. 527-28.

As Dr. Long's opinion provided an adequate basis for the ALJ to determine whether Plaintiff's IQ scores were consistent with a finding of mental retardation, there was no need for the ALJ to seek additional information from Dr. Long. See 20 C.F.R. § 404.1512(e) ("When the evidence we receive from your treating physician or psychologist or other medical source is *inadequate* for us to determine whether you are disabled, we will need additional

12

information to reach a determination or a decision.") (emphasis added). Moreover, as the Commissioner points out, Plaintiff's attorney did not object to the sufficiency of the evidence at the hearing, undermining his argument that the ALJ erred in failing to solicit further information from Dr. Long. Comm'r's Br., p. 8 (citing R. 38).

In sum, the Court concludes that the ALJ properly rebutted the presumption that Plaintiff suffers from mental retardation despite the IQ scores reported in Dr. Long's November 2009 psychological examination report.

### 2. Severity of Additional Impairments Moot

Plaintiff also argues that he satisfies the additional impairment prong of Listing 12.05(C) because the ALJ determined at step two of the sequential evaluation process that Plaintiff's degenerative disc disease, chronic serious otitis media, recurrent kidney/ureteral stones, mixed mood disorder, anxiety disorder, and borderline intellectual functioning were "severe" impairments. Pl.'s Br., pp. 19-20; R. 17. Plaintiff cites to Edwards ex rel. Edwards v. Heckler, 755 F.2d 1513, 1515 (11th Cir. 1985), for the proposition that the additional impairment prong is satisfied by "something less than 'severe' within the meaning of § 404.1520(c)." Therefore, he contends that "the ALJ's determination at Step 2 that he has multiple physical [and mental] impairments is *ipso facto* [proof] that he met the second prong of 12.05(C)." Pl.'s Br., p. 20. However, in light of Plaintiff's failure to show that he satisfies the first prong of Listing 12.05(C) concerning his intellectual functioning, his argument concerning the severity of his other physical and mental impairments is moot.[8]

---

[8] As noted above, in order to show that his impairment meets a Listing, Plaintiff needs to meet all of the specified criteria; an impairment that manifests only some of those criteria, no matter how severely, does not qualify. Zebley, 493 U.S. at 530.

In sum, the ALJ's finding at step three of the sequential evaluation process that Plaintiff did not meet or equal any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 – including Listing 12.05(C) – is supported by substantial evidence. Accordingly, Plaintiff is not entitled to relief on this issue.

## B. Plaintiff's Argument Regarding Consultative Examination Report Is Without Merit

Plaintiff also argues that he raised several objections to a consultative examination report provided by Vasudev V. Kulkarni, M.D., on which the ALJ relied in his opinion, yet the ALJ did not rule on Plaintiff's objections in his decision. Pl.'s Br. p. 25 (citing R. 501-17). Plaintiff objects that it is unclear whether Dr. Kulkarni prepared the report, that there is no description of what objective or clinical tests were done or what records were reviewed during the exam, and that the report "fails to list any diagnoses or medically determinable impairments." Id.

Contrary to Plaintiff's assertions, and as the Commissioner correctly notes, Comm'r's Br., p. 17, Dr. Kulkarni's name and signature appears *numerous* times on the examination report. R. 501, 503, 507, 513, 517. Although Plaintiff asserts that "[t]here is an illegible signature," Pl.'s Br., p. 25, he does not indicate which signature he is referring to, nor does it appear to the Court that any of the signatures are inconsistent or suspect in any way. Furthermore, the report indicates that Dr. Kulkarni tested Plaintiff's range of motion, conducted strength testing, assessed Plaintiff's physical work capabilities, and conducted a thorough physical exam of Plaintiff's systems. R. 504-17. Finally, contrary to Plaintiff's assertions, Dr. Kulkarni's report provides several diagnoses, including "chronic pain" in the right upper extremity and low back, history of hearing loss, history of mitral valve prolapse,

14

and history of kidney stones. R. 517. In short, Plaintiff's argument regarding Dr. Kulkarni's examination report is wholly without merit, and he is not entitled to relief on this issue.

### C.   Utilization of VE Testimony

Plaintiff also raises several arguments with regard to VE testimony provided in this case. Specifically, Plaintiff argues that VE Bennett exhibited bias towards him at the video hearing. Pl.'s Br., p. 21. Plaintiff also argues that the ALJ did not properly use VE Bennett at the video hearing because the hypothetical question presented by the ALJ did not accurately present Plaintiff's limitation in his reading ability or all of the environmental restrictions assessed in Dr. Kulkarni's consultative examination. Id. at 18, 25. Moreover, Plaintiff argues that after the video hearing, he obtained testimony from VE Horton, who reached different conclusions than VE Bennett with regard to the skill level of Plaintiff's past relevant work and the impact of Plaintiff's reading ability on his ability to perform other work; however, Plaintiff asserts the ALJ completely disregarded the testimony of VE Horton in his decision. Id. at 22, 24. Additionally, Plaintiff asserts that VE Bennett's testimony regarding Plaintiff's past relevant work conflicts with the Dictionary of Occupational Titles ("DOT"). Id. at 22.

By contrast, the Commissioner argues that Plaintiff's argument regarding bias on the part of VE Bennett is unsupported by the record. Comm'r's Br., p. 11 n.5. Moreover, the Commissioner asserts that substantial evidence supports the ALJ's findings on the skill level of Plaintiff's past relevant work and that Plaintiff could have performed work that existed in substantial numbers in the national economy through his date last insured. Id. at 10-13, 17-20.

### 1.   No Bias on the Part of VE Bennett

First, the Court addresses Plaintiff's argument that VE Bennett exhibited bias towards him at the hearing. According to Plaintiff, although his attorney did not object to VE Bennett's

testimony at the video hearing, Plaintiff's attorney later submitted objections to his testimony, asserting that VE Bennett exhibited bias following a discussion of the skill level of Plaintiff's past relevant work as a manufactured building repairer:

> . . . Toward the end of the hearing, after testimony was elicited related to the job Mr. Bennett identified as a Manufactured Building Repairer, Mr. Bennett was asked whether he was still of the opinion that the job was performed at an SVP of 4. Mr. Bennett responded that assuming [Plaintiff] was telling the truth, he guessed he would have to change his answer. The tone of his voice conveyed that Mr. Bennett doubted [Plaintiff's] veracity. . . .

Pl.'s Br., p. 21; R. 68-69, 311.

However, as the Commissioner correctly points out, Plaintiff misquotes VE Bennett. Comm'r's Br., p. 11 n.5. The hearing transcript reflects that after the ALJ solicited testimony from Plaintiff regarding the manner in which he performed work as a manufactured home builder, the following exchange occurred:

> ALJ: Mr. Bennett, if you assume the working conditions [INAUDIBLE] past performed, unskilled level.
>
> VE: [INAUDIBLE] your honor. If in fact that's all he was doing.
>
> ALJ: All right, so is that a sufficient [INAUDIBLE] for your purposes Ms. Flynn as performed, if what he says is true, it would be at an unskilled level?
>
> Pl.'s counsel: Yes, sir thank you.

R. 68-69. Thus, VE Bennett never stated that "assuming [Plaintiff] was telling the truth, he guessed he would have to change his answer," as Plaintiff's attorney represents. Moreover, the plain meaning of the language of the quoted exchange is not consistent with Plaintiff's interpretation. Rather, an objective reading of VE Bennett's response indicates that VE Bennett was simply responding to the ALJ's request that he make an assumption about the skill level of Plaintiff's past relevant work based on Plaintiff's explanation for how he performed

16

that work. Moreover, to the extent that Plaintiff takes issue with the tone of VE Bennett's response, Pl.'s Br., p. 21, he fails to make a showing adequate to give rise to a finding of bias on the part of VE Bennett, particularly because VE Bennett's testimony on this issue was *favorable* to Plaintiff. Indeed, Plaintiff cites no Regulations or case law to support his argument that VE Bennett demonstrated bias. Accordingly, Plaintiff is not entitled to relief on this issue.

### 2.     ALJ Failed to Sufficiently Utilize VE Testimony with Regard to Plaintiff's Reading Ability

The Court next turns its attention to Plaintiff's argument that the ALJ improperly used VE Bennett at the video hearing because the ALJ's hypothetical question did not accurately present Plaintiff's limitation in his reading ability.[9] Pl.'s Br., p. 18. Related to this argument is Plaintiff's assertion that the ALJ failed to consider the post-hearing testimony of VE Horton, who opined that Plaintiff's reading limitation would preclude him from performing the jobs identified by VE Bennett. Id. at 24. The Commissioner acknowledges that the ALJ did not discuss VE Horton's testimony, but argues that the ALJ's finding that Plaintiff was capable of performing other work through the date he was last insured is supported by substantial evidence. Comm'r's Br., pp. 13, 17-19.

At step four of the sequential evaluation process, the ALJ found that Plaintiff was unable to perform his past relevant work but had the residual functional capacity to perform a range of heavy work, R. 26-28, as set forth in detail, *supra*, at pages 2-3. Because Plaintiff

_____

[9]As the Court concludes, *infra*, that the ALJ's decision is due to be remanded because it is not clear whether the hypothetical properly addressed the limitation on Plaintiff's reading ability, the Court does not reach Plaintiff's related argument that the hypothetical did not include all the environmental limitations assessed by Dr. Kulkarni. Pl.'s Br., p. 25.

could no longer perform his past relevant work, the burden shifted to the Commissioner to show the existence of other types of substantial gainful employment that Plaintiff could perform given his age, education, previous work experience, and residual functional capacity. In this regard, the ALJ properly consulted a VE in conjunction with the Medical-Vocational Guidelines. At Plaintiff's video hearing, the ALJ submitted the following hypothetical to VE Bennett:

> Mr. Bennett, I would like you to make these assumptions for our hypothetical individual, age range 30 to 38, 12th grade education, being in special education classes. The individual passed the reading test for grade level 12, passed the math test for 10th grade math. Assume that he has the same past work as manufactured building repair, material handler and construction worker. Assume any functions not specifically addressed in the hypothetical can be performed. Exertional capabilities are as follows, can frequently lift 25 to 50 pounds, can stand or walk up to six hours at a time in an eight hour total, likewise can sit six hours a time up to an eight hour total. With respect to hazards such as unprotected heights and moving machinery, the individual should avoid frequent exposure but can tolerate occasional (sic), has a limited but satisfactory ability for the following, handle detail things (sic), handle complex things, interact with supervisors, include in that the stress and change in workplace, finally there is a restriction on the tolerance for noise, he can tolerate a moderate level of noise, claimant should be confined in an office space. . . .

R. 62-63. The VE testified that such an individual would be capable of performing work as a recreation aide, cashier II, and counter attendant, each of which has a specific vocational preparation ("SVP") of two. R. 64. Next, Plaintiff's attorney modified the ALJ's hypothetical in the following way:

> Q: Mr. Bennett, I'm going to take the judge's first hypothetical and to that I'm going to add the following limitations, occasional push and pulling with the upper extremities, occasional reaching, handling and fingering on the right dominant side.
>
> . . . .
>
> Does that still allow for the performance of those three jobs that you listed?

A: Just one second please. No, it wouldn't.

Q: Are there other jobs that a person with such hypothetical limitations would be able to perform?

R. 64-65. VE Bennett responded that such a hypothetical individual would be able to perform the jobs of call-out operator, counter clerk, and surveillance system monitor, each of which has an SVP of two. R. 65-66.

After the video hearing, Plaintiff obtained and submitted to the ALJ a sworn statement from VE Horton, who provided testimony in response to questions by Plaintiff's counsel:

Q: Ms. Horton, I'm going to ask you some questions about literacy levels and SVP levels and then I want to ask you about some jobs [VE Bennett] identified in response to the judge's only hypothetical.

A: Okay.

Q: What is the difference between an SVP of 1 and an SVP of 2?

A: An SVP of 1 is defined as a job that requires a short demonstration only to become efficient at a job. An SVP of 2 is defined as anything beyond the short demonstration, up to and including one month, to become proficient at performing the job.

A: Okay. If someone has a reading level that has the grade equivalent for grade 1.9, would that impact someone's ability to perform work at either an SVP of 1 or 2?

R. 317. VE Horton replied that, rather than a consideration of SVP, the more relevant consideration was whether someone with a reading level at a grade equivalence of 1.9 could satisfy the language development requirement of the DOT's General Educational Development ("GED") for a given job.[10] See id. Plaintiff's attorney then asked VE Horton whether an

---

[10]GED "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance," and are scaled in three divisions: reasoning development, mathematical development, and language development; reading ability is a

19

individual with a reading level of 1.9 would satisfy the language development requirement for work as a call-out operator, counter clerk, or surveillance systems monitor – the three jobs identified in the alternative hypothetical by VE Bennett. Id. at 318. VE Horton responded that such an individual would not be able to perform those jobs. Id.

Plaintiff specifically takes issue with the reading level described in the ALJ's hypothetical question to VE Bennett: first, Plaintiff argues that Dr. Long's psychological evaluation, discussed above, shows that he has a deficiency in his reading ability and that his GED reading level is equivalent to 1.9. See Pl.'s Br., p. 18; R. 525-27. Further, Plaintiff argues that although he passed the reading portion of the Georgia Basic Skills Test in 12th grade, his reading ability was only ranked in the 11th percentile; thus, he contends that it is inaccurate to say that he is capable of reading at a 12th grade level. Pl.'s Br., pp. 18, 24 (citing R. 299). Moreover, Plaintiff argues that VE Horton's testimony shows that the ALJ's characterization of his reading ability prejudiced him because VE Horton ruled out several of the jobs identified by VE Bennett in the alternative hypothetical, which raises the issue of whether the jobs identified in the original hypothetical would similarly have been precluded. Id. at 24 (citing R. 317-18). Plaintiff additionally argues that the ALJ erred in failing to address or even acknowledge VE Horton's testimony in his decision, and thus the ALJ's conclusion that Plaintiff can perform the jobs identified by VE Bennett in the original hypothetical question is not supported by substantial evidence. Id.

---

skill encompassed within the language development division. See Dictionary of Occupational Titles (4th Ed., Rev. 1991), Appendix C, *available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (last visited June 5, 2012).

Of course, the underlying assumptions of hypothetical questions must accurately and comprehensively reflect the claimant's characteristics, and a reviewing court must determine whether they are supported by substantial evidence. McSwain v. Bowen, 814 F.2d 617, 619-20 (11th Cir. 1987) (per curiam); Pendley v. Heckler, 767 F.2d 1561, 1562-63 (11th Cir. 1985) (per curiam); see also Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999) ("In order for a VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."); Coleman v. Barnhart, 264 F. Supp.2d 1007, 1011 (S.D. Ala. 2003) (failing to comprehensively describe a claimant's impairments and limitations, including that a claimant "often" has deficiencies in concentration, persistence or pace, is grounds for remanding case for further proceedings).

Here, Plaintiff points to specific evidence to show that he suffers a limitation in his reading ability. First, Dr. Long's report shows that Plaintiff obtained deficient scores in tests of verbal comprehension and reading ability. R. 525-27. Moreover, although the ALJ correctly observed that Plaintiff passed the reading portion of the Georgia Test of Basic Skills when he was in 12th grade, R. 26, Plaintiff points out that his score was only in the 11th percentile, suggesting that his reading ability was, at the least, below average. Pl.'s Br., pp. 18, 24; R. 299. Indeed, the Court notes that Plaintiff only passed the reading portion of this exam after four failed attempts in the 10th and 11th grades. R. 299. Given this evidence, the Court does not agree with the ALJ's conclusion that since Plaintiff passed a test of *basic* reading skills when he was in 12th grade, he can therefore read at the 12th grade level.

The Commissioner makes a reasoned attempt at discrediting Plaintiff's alleged reading level of 1.9 in light of the other evidence in the record, namely that Plaintiff's past relevant work required a greater reading ability than a reading level of 1.9 would allow for. Comm'r's

21

Br., pp. 18-19. It may well be, as the Commissioner argues, that in light of the overall record, Plaintiff's limitation in his reading ability is not supported to the extent he alleges and thus it does not belong in the ALJ's hypothetical. However, it is incumbent upon the ALJ to address Plaintiff's limitation in his reading ability, particularly in light of Dr. Long's finding that Plaintiff was deficient in verbal comprehension, reading, and writing, R. 525-27, so that the ALJ's reasons are clear for including or omitting this limitation when presenting hypothetical questions to the VE. Because the ALJ did not adequately support his finding that Plaintiff can read at the 12th grade level, it is not clear that his hypothetical to VE Bennett appropriately incorporated all of Plaintiff's impairments and limitations. Therefore, a remand is warranted so that the ALJ can consider the extent of Plaintiff's alleged reading impairment and, if necessary, make any adjustments to the list of impairments in the hypothetical presented to the VE. Simmons v. Barnhart, No. 03-11485, slip op. at 5 (11th Cir. Nov. 28, 2003) (rejecting district court's harmless error analysis of ALJ's failure to include all identified limitations in hypothetical to VE and citing Pendley, 767 F.2d at 1561, for the proposition that courts should not assume type of answer that VE may provide if presented with additional limitations for claimant).

Moreover, the ALJ's decision completely fails to mention VE Horton or her testimony, which, as Plaintiff persuasively argues, calls into question whether Plaintiff is capable of performing the jobs identified by VE Bennett during the video hearing. R. 317-18. As noted above, the ALJ's decision must be grounded in the entire record. McCruter, 791 F.2d at 1548. Here, because the ALJ's decision focuses on VE Bennett's testimony while failing to discuss or even mention VE Horton's contrary testimony, his decision is therefore not based upon substantial evidence. Id.; see Jusick v. Comm'r of Soc. Sec., No. 610-126, 2011 WL 1059106,

22

at *12 (M.D. Fla. Mar. 21, 2011) (remanding based in part on the basis that ALJ had relied solely on testimony of one VE while ignoring contrary report of VE submitted by claimant); see also Smith v. Chater, 97 F.3d 1465 (Table), 1996 WL 557753, at *1-2 (10th Cir. 1996) (remanding case based on ALJ's failure to discuss VE report submitted after hearing). Thus, the ALJ's failure to address VE Horton's testimony provides another basis for remanding this case so that the ALJ can consider what impact, if any, VE Horton's testimony has on Plaintiff's disability determination.[11]

## IV.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS**, pursuant to sentence four of 42 U.S.C. § 405(g), that the Commissioner's final decision be **REVERSED** and that the case be **REMANDED** to the Commissioner for further consideration in accordance with this opinion.

SO REPORTED and RECOMMENDED this 15th day of June, 2012, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

_____

[11]Because the Court is recommending that the case be remanded based on the failure to address VE Horton's testimony and so that the ALJ can re-evaluate and address Plaintiff's reading ability and the potential impact on the hypothetical presented to the VE, the Court need not address Plaintiff's remaining allegations of error in detail. Of course, upon remand, Plaintiff's claims must be evaluated in compliance with the applicable regulations and case law in all aspects. For example, should any conflicts between VE testimony and information in the DOT arise, the Court presumes that the ALJ will provide a reasonable explanation for any such conflicts. SSR 00-4p. Moreover, the determination of whether Plaintiff is capable of performing other work must be based solely on jobs that exist in sufficient numbers in the national and regional economies and which Plaintiff is capable of performing in light of his RFC, age, education, and work experience. See 20 C.F.R. § 404.1512(g), & 404.1560(c).

23